1

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
2                 SAVANNAH DIVISION

3

UNITED STATES OF AMERICA,    )
4                            )
        Plaintiff,           )
5                            )
   vs.                       )      CASE NO. 4:19-MJ-47-10
6                            )      CASE NO. 4:19-CR-150
OLEG NIKITIN,                )
7                            )
        Defendant.           )
8  ---------------------------

9

10

11

12

13           TRANSCRIPT OF DETENTION HEARING
        **BEFORE THE HONORABLE CHRISTOPHER L. RAY**
14              United States Courthouse
                   125 Bull Street
15                 Savannah, GA
                September 25, 2019

16

17

18

19  COURT REPORTER:   Kelly A. McKee, CCR, RMR, CCP, RDR
                      United States Court Reporter
20                    P. O. Box 8552
                      Savannah, GA  31412
21                    912-650-4065

22

23

24     (Proceedings recorded by FTR, transcript subsequently
    produced by mechanical stenography, along with computer-aided
25  transcription.)

2

```
1                  APPEARANCES OF COUNSEL

2    FOR THE UNITED STATES OF AMERICA:

3        JENNIFER GAYLE SOLARI, Esq.
         STEVEN L. LEE, Esq.
4        U.S. ATTORNEY'S OFFICE - SAVANNAH
         P. O. Box 8970
5        Savannah, GA 31412
         912-201-2561
6        Email:  jennifer.solari@usdoj.gov

7    FOR THE DEFENDANT:

8        AARON M. DANZIG, Esq.
         ARNALL GOLDEN GREGORY
9        171 17th Street, N.W.
         Suite 2100
10       Atlanta, GA  30306
         404-873-8504
11       Email:  aaron.danzig@agg.com

12       ANDREW S. JOHNSON, Esq.
         ARNOLD & STAFFORD
13       128 South Main Street
         Hinesville, GA  31313
14       912-289-0673

15

16                      I N D E X

17                                              PAGE
     WITNESSES
18       John Conley
             Direct Examination by Ms. Solari       6
19           Cross-Examination by Mr. Danzig       17
             Redirect Examination by Ms. Solari    23
20
     Certificate of Reporter                       41
21

22

23

24

25
```

3

1                         **P R O C E E D I N G S**

2                              **(9:12 a.m.)**

3           THE COURT:  All right.  Good morning, everyone.  Would

4     you please call the first case.

5           THE CLERK:  First case is 4:19-MJ-10, *United States of*

6     *America vs. Oleg Nikitin.*

7           MS. SOLARI:  Good morning, Your Honor.  Jennifer Solari

8     and Steven Lee for the government.  We're ready.

9           MR. DANZIG:  Good morning, Your Honor.  Aaron Danzig

10    from Arnall Golden Gregory.  I have an entry of appearance that

11    I'll submit after the hearing on behalf of Mr. Nikitin.

12          MR. JOHNSON:  And Andrew Johnson on behalf of

13    Mr. Nikitin as well, Your Honor.

14          THE COURT:  Thank you.  And, Counsel, spelling of your

15    last name, please?

16          MR. DANZIG:  D-A-N-Z-I-G.

17          THE COURT:  Thank you, Mr. Danzig.  All right.  I am

18    informed that Mr. Nikitin, while he has some facility in the

19    English language, is a native speaker of Russian; and therefore,

20    it would be beneficial to have an interpreter available for us

21    to interpret today.  The Court has engaged Ms. Inna Adams to

22    perform that function, and I'll ask that she be sworn in before

23    we do anything else.

24          THE CLERK:  Ms. Adams, if you could stand up and raise

25    your right hand.

4

1              (Interpreter sworn)

2           THE INTERPRETER:  Yes.  So help me God.

3           THE COURT:  All right.  Counsel, and any witnesses,

4    because of the use of an interpreter today, it is my intent to

5    speak in a truncated fashion, in small blocks of sentences.  And

6    I will ask and encourage counsel and witnesses to do the same.

7    I have told the interpreter that if we move too quickly for her

8    at any time, she's welcome to raise her hand and tell me and

9    make us stop.

10          As I understand it, Mr. Nikitin had his initial

11   appearance before Judge Epps last week, and based upon my review

12   of the audio recording, I understand that the questions of

13   detention and a preliminary hearing were deferred.

14          Ms. Solari, we're here, I presume, on the detention

15   hearing today?

16          MS. SOLARI:  Yes, sir, Your Honor.

17          THE COURT:  What about the issue of the prelim?  Is that

18   ripe for today or is that for later consideration?

19          MS. SOLARI:  I would respectfully ask the Court that we

20   consider it for a later time given the government intends to

21   present an indictment in this matter to the grand jury, which if

22   it were true billed --

23          THE COURT:  Slowly.  Slowly, Ms. Solari.

24          MS. SOLARI:  Sorry.  If the defendant were indicted by

25   the grand jury, I would expect that to happen not later than

1   October 2nd.

2       THE COURT:  Which would be just about the 14-day window

3   if I were to detain him.

4       MS. SOLARI:  I believe that's correct, sir.  I think we

5   might be just inside the 14 days.

6       THE COURT:  All right.  Well, insofar as we are here

7   this morning on the government's detention motion, I shall hear

8   from the government first and any argument, evidence or

9   witnesses you wish to present.

10      MS. SOLARI:  Thank you, Your Honor.  The government

11  calls Special Agent John Conley.

12      Your Honor, Agent Conley is coming in from the field

13  today, and hence, the field attire.  Thank you, Your Honor, for

14  your understanding.

15      THE CLERK:  If you would raise your right hand.

16              JOHN CONLEY, being first duly sworn,

17  testified as follows:

18      THE WITNESS:  I swear.

19      THE CLERK:  Thank you.

20      MS. SOLARI:  And, Your Honor, for the record, I don't

21  know that we identified it at the previous hearing, but the

22  government has moved for detention under 18 U.S.C. 3142(f)(2)(A)

23  based on the serious risk that the defendant would flee the

24  jurisdiction.

25      THE COURT:  Let's give the interpreter just a moment.

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

6

1      Counsel, and the witness, I, again, would remind you if

2   you could please try to keep give and take slowly, and we won't

3   have interruptions for the benefit of the court reporter -- I'm

4   sorry, the interpreter.

5                   DIRECT EXAMINATION

6   BY MS. SOLARI:

7   Q.   Special Agent Conley, are you one of the case agents

8   handling the investigation of the defendant, Mr. Nikitin?

9   A.   I am.

10  Q.   Were you the affiant who swore to the affidavit in support

11  of a criminal complaint submitted to this Court on September

12  12th of this year?

13  A.   I was.

14  Q.   Based on your investigation to date, can you tell the

15  Court whether the facts you set forth in that affidavit are

16  still true and accurate to the best of your knowledge and

17  belief?

18  A.   They are still true and accurate.

19  Q.   And, thus, would you adopt the facts set forth in that

20  affidavit as part of your sworn testimony here today?

21  A.   Yes.

22      MS. SOLARI:   I ask the Court's indulgence, Your Honor,

23  in adopting as part of the agent's testimony Document 82-1 in

24  this case.  I thought that might save the interpreter some time

25  such that we don't regurgitate all the facts therein.

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

7

1          THE COURT:  Mr. Danzig, any objection?

2          MR. DANZIG:  No, Your Honor.

3          THE COURT:  I'll allow it.  Please proceed.

4          MS. SOLARI:  Thank you, Your Honor.

5   BY MS. SOLARI:

6   Q.   Special Agent, I believe the complaint left off noting

7   that the defendant had been issued a visa allowing him to travel

8   to the United States and that the government expected him to do

9   so for some purpose related to this investigation.  Is that

10  right?

11  A.   That is correct.

12          THE INTERPRETER:  Excuse me.  You said the defendant

13  received the visa?

14          MS. SOLARI:  Yes.

15          THE INTERPRETER:  By the U. S. Government or Russian

16  Government?  U. S. Government?

17          THE WITNESS:  From the U.S. Government.

18  BY MS. SOLARI:

19  Q.   Did the defendant, in fact, travel to the United States?

20  A.   Yes, he did.

21  Q.   Did he arrive in the U. S. on or about September 17th,

22  2019?

23  A.   Yes, he did.

24  Q.   In furtherance of your investigation, did you coordinate

25  an undercover operation to take place at that time?

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

8

1    A.    Yes, I did.

2    Q.    Please describe generally the nature of that undercover

3    operation.

4    A.    With a cooperating defendant that was working with us to

5    meet with Mr. Nikitin here in Savannah after Mr. Nikitin arrived

6    in the U. S., I believe in New Jersey, and traveled to Savannah

7    the following day.

8    Q.    Was that cooperating defendant Mr. Villone?

9    A.    That's correct.

10   Q.    Did Mr. Villone agree to engage the defendant in

11   conversations about the facts outlined in the criminal

12   complaint?

13   A.    He did.

14   Q.    Were those conversations between Mr. Villone and the

15   defendant recorded?

16   A.    They were.

17   Q.    I have, to play for the Court, a snippet of a recording

18   between Mr. Villone and Mr. Nikitin.  Are you familiar with the

19   recording I'm speaking of?

20   A.    I am.

21   Q.    Could you please provide us some context for the

22   conversation we would hear in the recording?

23   A.    The recording took place after Mr. Villone picked up

24   Mr. Nikitin at the Savannah Airport and en route to

25   Mr. Nikitin's hotel room at the Best Western Savannah.

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

9

1   Q.   Now, the portion we are about to hear, it's not the

2   entirety of their conversation; is that right?

3   A.   That is correct.

4   Q.   But is the context and the meaning of the conversation

5   accurately represented in this recorded portion?

6   A.   It is.

7        MS. SOLARI:  May I approach the witness, Your Honor?

8        THE COURT:  You may.

9        MS. SOLARI:  Thank you, sir.

10       THE COURT:  I assume Mr. Danzig has seen that?

11       MR. DANZIG:  Yes, Your Honor.  I have a copy.

12  BY MS. SOLARI:

13  Q.   Special Agent, I have provided you what I've previously

14  marked as Government's Exhibit 1B for identification.  The

15  recording will be Government's Exhibit 1A.  What is 1B?

16  A.   1B is the transcript of that portion of the recording.

17  Q.   And have you reviewed it prior to your testimony here

18  today?

19  A.   I have.

20  Q.   Is it a true and accurate recitation of the conversation

21  captured in the recording?

22  A.   It is.

23  Q.   And where we see the letters IA, does that indicate that

24  thus far that portion of the conversation seems to be inaudible?

25  A.   It is.

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

10

1       MS. SOLARI:  Your Honor, at this time the government

2  would offer Government 1A and 1B and ask to play the recording,

3  which is 1A.

4       THE COURT:  Mr. Danzig, any objection?

5       MR. DANZIG:  No objection, Your Honor.

6       THE COURT:  All right.  Government's 1A and 1B will be

7  admitted without objection, and Ms. Solari, you can play your

8  audio recording.  I have a copy of the transcript.

9       MS. SOLARI:  Thank you, Your Honor.  I'm sorry, Your

10 Honor.  My computer locked.

11                      (Audio played)

12 BY MS. SOLARI:

13 Q.   Special Agent, I think we know from the criminal

14 complaint, but what is the relation to Gazprom, or more

15 specifically, Gazprom Neft to this investigation?

16 A.   Gazprom Neft is the entity that was procuring this piece

17 of equipment.

18 Q.   And what --

19       THE COURT:  Hold on.

20       THE INTERPRETER:  Excuse me.  Can you repeat, please,

21 the last statement?

22       THE WITNESS:  Gazprom Neft is the entity attempting to

23 procure this piece of equipment.

24 BY MS. SOLARI:

25 Q.   And had the defendant entered into a contract with Gazprom

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

11

1   Neft to procure this equipment on its behalf?

2   A.    Yes, he had.

3   Q.    The defendant refers to Gazprom under the embargo; is that

4   correct?

5   A.    That is correct.

6         MR. DANZIG:  I just object, Your Honor.  I know it's

7   written "embargo" on there.  I'm not sure that I understood it

8   to say quite that same word.  So I just object, Your Honor.

9         THE COURT:  Is that initial translation, Mr. Danzig?

10        MR. DANZIG:  It may be.

11        THE COURT:  Or you're taking issue with the

12  transcription of the audio?

13        MR. DANZIG:  I'm taking issue with the transcription of

14  the audio.  I'm not quite sure it said that.  I heard something

15  similar, but I'm not sure if that's the same thing or if it

16  means something different.

17        THE COURT:  Well, why don't we go back and play it

18  again.  It's not very lengthy.

19        MS. SOLARI:  I believe the way it was pronounced was

20  embarga (ph).  I think I also just heard the translator

21  translate embargo as "embarga."  May I ask her the Russian word

22  for embargo?

23        THE COURT:  You may, Ms. Solari.

24        THE INTERPRETER:  Embargo.

25        MS. SOLARI:  "Embarga" is embargo?

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

12

1          THE INTERPRETER:  Uh-huh.

2          MS. SOLARI:  Thank you, ma'am.  I'm happy to play it

3     again if --

4          MR. DANZIG:  I don't think you need to, Your Honor.

5          THE COURT:  All right.  Thank you, Mr. Danzig.

6          Proceed, Ms. Solari.

7          MS. SOLARI:  Thank you.

8     BY MS. SOLARI:

9     Q.   Gazprom under the embargo, or in Russian, "embarga," what

10    is the significance of that in relation to this case?

11    A.   It would indicate that Mr. Nikitin was aware that Gazprom

12    or Gazprom Neft was not allowed to obtain this piece of

13    equipment without having received a license to do so.

14    Q.   And, similarly, U. S. export regulations prohibit any

15    other person from doing that on Gazprom's behalf?

16    A.   That is correct.

17    Q.   At the conclusion of this undercover operation, did you

18    and other agents place the defendant under arrest?

19    A.   We did.

20    Q.   Did you advise him of his constitutional rights?

21    A.   We did.

22    Q.   Did he indicate to you whether he understood those rights?

23    A.   He did indicate he understood the rights.

24    Q.   With that understanding, did he agree to waive those

25    rights and speak with you and other agents?

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

13

1   A.    He did.

2   Q.    Who did the defendant tell you he understood was the

3   intended end user of the commodity in this case?

4   A.    Gazprom Neft.

5   Q.    According to the defendant, where was the item to be used?

6   A.    I'm not going to pronounce that correctly, but it's an

7   Arctic drilling platform.  I won't be able to pronounce it.  If

8   somebody knows the pronunciation.  Promulzinik (ph) or something

9   along those lines.

10  Q.    Thank you.  I want to talk with you about why that's

11  significant.  Does the export regulation specifically prohibit

12  export of this commodity for use upon Arctic drilling platforms

13  in Russia?

14  A.    It does.

15  Q.    According to the defendant, how did he and others intend

16  to get this commodity there?

17  A.    They intended to export to the United Arab Emirates and

18  then transfer it from there to Russia.

19  Q.    Now, the contract between the defendant's company and

20  Mr. Villone's company indicated, did it not, that this item was

21  to go to a sugar manufacturing plant?

22  A.    That's correct.

23  Q.    What did the defendant tell you about the accuracy of that

24  portion of the contract?

25  A.    Something along the lines that we all know this can't be

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

14

1   used in a sugar factory.

2   Q.    What term or terms did the defendant use to refer to that

3   and other false statements made by himself and co-conspirators

4   in this plan?

5   A.    He referred to it as business fog.

6   Q.    Business fog.  Following your interview with the

7   defendant, did he agree to assist you with your investigation?

8   A.    He did agree to do so.

9   Q.    And in the days following, did you provide him

10  opportunities to do that?

11  A.    We did.

12  Q.    Did you offer him specific tasks he could perform to

13  assist the investigation?

14  A.    We did.

15  Q.    Did the defendant perform those tasks?

16  A.    He did not.

17  Q.    Now, to be clear, was the defendant ever contentious or

18  unprofessional with you?

19  A.    No.

20  Q.    Did he provide you consent to view the contents of his

21  email account?

22  A.    He did.

23        THE COURT:  Ms. Solari, would you repeat that question

24  for the benefit of the translator?

25                        (Nothing omitted)

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

15

1    BY MS. SOLARI:

2    Q.    Did the defendant give you consent to view the contents of

3    his email account?  Did he provide a user name and a password?

4    A.    He did.

5    Q.    Did agents attempt to access that account?

6    A.    We have.

7    Q.    How did that go?

8    A.    We were not able to access the account.

9    Q.    So it appears that some of the information given to you

10   was either misunderstood or it was inaccurate?

11   A.    That's correct.

12   Q.    Are you aware of any bank accounts or real property owned

13   or held by the defendant here in the United States?

14   A.    I am not aware of any.

15   Q.    Do you have in evidence custody the defendant's passport?

16   A.    I do.

17   Q.    Based on your training and experience with your agency and

18   previously with Homeland Security, are you aware of any way the

19   defendant could leave the United States without his passport?

20   A.    Yes.  He would be able to go to a Russian Consulate or

21   Embassy and request travel documents.

22   Q.    And with those travel documents could he successfully

23   leave the United States and return to Russia?

24   A.    He could if he crossed a border.

25   Q.    I'd like to visit one more issue, Special Agent, if I may.

JOHN CONLEY - DIRECT EXAMINATION BY MS. SOLARI

16

1   When the defendant was booked into custody in the Liberty County

2   Jail, were there any issues regarding the identity under which

3   he was booked?

4   A.    Yes.  There was some misunderstanding of his identity at

5   the time he was taken into custody by Liberty County.

6   Q.    Now, that misunderstanding, as far as we know, was not --

7         THE COURT:  Hold on.

8         THE INTERPRETER:  Can you please say what was the -- I

9   didn't understand.  Misunderstood that he got into custody or --

10  BY MS. SOLARI:

11  Q.    Yes.  Is it true that the jail used a name other than the

12  defendant's when he was assigned at the jail?

13  A.    Yes.  That's correct.

14  Q.    Now, that misunderstanding was not caused by the

15  defendant; correct?

16  A.    It was not.

17  Q.    However, are you aware of the defendant ever correcting

18  that mistake or raising any objection to being booked under an

19  incorrect identity?

20  A.    I am not aware of any objection on his part.

21  Q.    And simply for clarity, we can't say for sure whether the

22  defendant was aware of the mistake, can we?

23  A.    Not for sure.

24        MS. SOLARI:  That's the government's showing, Your

25  Honor.

JOHN CONLEY - CROSS-EXAMINATION BY MR. DANZIG

17

1    THE COURT:  All right.  Thank you, Ms. Solari.

2    Mr. Danzig, any cross-examination?

3    MR. DANZIG:  Yes, Your Honor, briefly.  And I apologize.

4  I have an iPad that they let me come in with, thankfully,

5  because it has some notes on it.

6    THE COURT:  I understand.

7                    CROSS-EXAMINATION

8  BY MR. DANZIG:

9  Q.    Agent Conley, my name is Aaron Danzig.  I represent

10 Mr. Nikitin.  How are you?

11 A.    Good, sir.  How about you?

12 Q.    Doing okay.  Thank you.  Did I hear you correctly that

13 with respect to this name issue at the jail, you are not aware

14 that Mr. Nikitin was even aware that there was an issue with his

15 name?  Is that right?

16 A.    That's correct.

17 Q.    And this case, as I understand your complaint, relates to

18 a turbine used to generate power; right?

19 A.    Correct.

20 Q.    And it's called the VECTRA 40G?

21 A.    That's correct.

22 Q.    And that turbine is made by a company called Dresser-Rand

23 that's owned by Siemens; right?

24 A.    That's correct.

25 Q.    Siemens is a --

JOHN CONLEY - CROSS-EXAMINATION BY MR. DANZIG

18

1    THE COURT:  Mr. Danzig, could I ask you to slow down

2    just a little?

3    MR. DANZIG:  Sorry, Your Honor.

4    THE COURT:  For the interpreter.  I think she's having a

5    hard time keeping up.

6    BY MR. DANZIG:

7    Q.   Siemens is a giant company all over the world; is that

8    right?

9    A.   To my understanding, yes.

10   Q.   It has offices and facilities both inside and outside the

11   United States; correct?

12   A.   Yes.

13   Q.   And the turbine at issue is a used turbine; right?

14   A.   Correct.

15   Q.   That is sold by or can be sold by Siemens throughout the

16   world; correct?

17   A.   That's correct.

18   Q.   As I understood your complaint, the allegation is that

19   Mr. Nikitin's company is called KS Engineering?

20   A.   Yes, sir.

21   Q.   And KS Engineering, as I understand your complaint, is a

22   Russian company; correct?

23   A.   Correct.

24   Q.   And it had a contract with a company owned by a gentleman

25   named Villone; is that correct?

JOHN CONLEY - CROSS-EXAMINATION BY MR. DANZIG

19

1    A.    Yes, sir.

2    Q.    And Villone's company -- I'm not sure I can find it on

3    here quickly.  But it is an Italian company; is that correct?

4    A.    That is.

5    Q.    So a Russian company had a contract with an Italian

6    company by which that Italian company would obtain a used

7    turbine sold by a worldwide multi-national company; correct?

8    A.    Correct.

9    Q.    And as I understood your complaint, communications -- and

10   the recording, communications involving Mr. Nikitin were with

11   the Italian gentleman, Mr. Villone; correct?

12   A.    That is correct.

13   Q.    And you offered a recording that was noted, identified, as

14   a partial recording; correct?

15   A.    Correct.

16   Q.    How --

17          THE COURT:  Hold on one moment, Mr. Danzig.  Are we

18   keeping up?

19          THE DEFENDANT:  It's okay.  I understand well.

20          THE COURT:  Well, I understand that Mr. Nikitin has

21   great facility with English, but I still would like to make sure

22   that everything is interpreted.  So let us continue, but please

23   continue to interpret.

24          Mr. Danzig, sorry to interrupt.  Please continue.

25          MR. DANZIG:  Thank you, Your Honor.

JOHN CONLEY - CROSS-EXAMINATION BY MR. DANZIG

20

1   BY MR. DANZIG:

2   Q.   How many hours of recordings do you have between

3   Mr. Villone and Mr. Nikitin?

4   A.   To be honest with you, sir, I have no idea how many hours

5   we have.

6   Q.   Multiple hours?

7   A.   That's correct.

8   Q.   More than five?

9   A.   I honestly don't know the time.

10  Q.   And you provided to the Court today a clip that was

11  approximately a minute and 30 seconds; correct?

12  A.   That's correct.

13  Q.   In your affidavit you make note that Mr. Villone -- excuse

14  me -- Mr. Nikitin stated in travel documents that he intended to

15  travel to the United States and listed Hainesport, New Jersey as

16  a location where he was staying.  Do you recall that?

17  A.   Yes, sir.

18  Q.   And, in fact, Mr. Nikitin did travel to the United States

19  and did go to Hainesport, New Jersey; isn't that right?

20  A.   That's correct.

21  Q.   And Mr. Nikitin is -- strike that.  In your affidavit and

22  as I understood your testimony today, is it correct that an

23  entity on an embargo list could receive a license or permit by

24  which to export equipment from the United States to that entity?

25  A.   It is possible, with a likelihood of being refused.

JOHN CONLEY - CROSS-EXAMINATION BY MR. DANZIG

21

1  Q.    I'm sorry, Your Honor?  I mean --

2  A.    It is possible, with a likelihood of being refused.

3  Q.    You don't make the determination on the refusal or

4  granting of such licenses.  That's not your job; correct?

5  A.    That is correct.

6  Q.    And just so we're clear, there is a process in the

7  Department of Commerce by which an entity can apply for and

8  receive a license or authorization by which to sell a product to

9  an entity that's on some sort of embargoed list; correct?

10 A.    On the entity list.  That's correct.

11 Q.    Correct.  When Mr. Nikitin was arrested, you said he was

12 offered specific tasks to do.  Do you recall that?

13 A.    Yes.

14 Q.    And part of that was that the government wanted to enlist

15 Mr. Nikitin to contact people overseas and perhaps bring them

16 into the United States; correct?

17 A.    That --

18      THE COURT:  The interpreter has -- hold on.  You can

19 answer, Special Agent Conley.

20      THE WITNESS:  Could you ask the question again?

21 BY MR. DANZIG:

22 Q.    The -- what you were requesting of Mr. Nikitin was to

23 contact people overseas to try and bring them into the United

24 States; correct?

25 A.    Partially.  If somebody volunteered to come to the United

22

1    States at that point, then yes.  Or to another country.

2    Q.    And he was willing to do that; correct?

3    A.    He was hesitant to do that.

4    Q.    He didn't refuse to do that, though; right?

5    A.    He also did not do that.

6    Q.    Well, part of the issue, though, was your concern that it

7    wouldn't work if people overseas knew that he'd been arrested;

8    right?

9    A.    That is correct.

10   Q.    All right.  And when he didn't -- or his wife didn't hear

11   from him, calls were made, including to the Consulate, to find

12   out that in fact he had been arrested; correct?

13   A.    At some point, yes, that would be correct.

14   Q.    Well, it's public knowledge, correct, that he'd been

15   arrested --

16            THE INTERPRETER:  Excuse me?  I'm sorry.

17            MR. DANZIG:  I'm sorry.

18            THE INTERPRETER:  You're going to have to slow down --

19            MR. DANZIG:  My apologies.

20            THE INTERPRETER:  -- before we wait for the answer,

21   because I want to translate expertly.

22            THE COURT:  Mr. Danzig, I am in no rush.

23            THE INTERPRETER:  I'm sorry.  Can you repeat, please,

24   about Consulate, because I understand it's important for him,

25   and I just want the defendant to understand perfectly.

1        THE COURT:  Take your time.  You have my undivided

2   attention.  We will get there when we get there.  If you'd ask

3   the first question again.

4        THE INTERPRETER:  I'm sorry.  About the Consulate.

5   BY MR. DANZIG:

6   Q.   The question that I have pending I'd like answered is that

7   it was publicly available knowledge that Mr. Nikitin had been

8   arrested because you could look on the Liberty County Jail

9   website and, in fact, see his name; correct?

10  A.   That did become available, yes.

11  Q.   Which would then lessen the ability, in your view, for him

12  to cooperate if people were aware that he'd already been

13  arrested; correct?

14       THE COURT:  Wait on the response.  All right.  You can

15  answer.

16       THE WITNESS:  That would be correct.

17       MR. DANZIG:  Thank you, Agent Conley.

18       THE COURT:  Ms. Solari, any redirect?

19       MS. SOLARI:  Briefly, Your Honor.

20                      REDIRECT EXAMINATION

21  BY MS. SOLARI:

22  Q.   Special Agent, where is the VECTRA 40G manufactured when

23  it was still in manufacture?

24  A.   In the United States solely.

25  Q.   Does Siemens now sell not what they refer to as used

24

1   VECTRAs, but refurbished VECTRAs?

2   A.    That's correct.

3   Q.    Where are they refurbished?

4   A.    Here in the United States only.

5   Q.    In your post-arrest interview with the defendant, what did

6   he tell you about his knowledge of where the VECTRA is made or

7   refurbished?

8   A.    That he understood it was made or refurbished in the

9   United States.

10  Q.    And only in the United States?

11  A.    That's correct.

12  Q.    Are you aware of a letter that Mr. Villone sent to KS

13  Engineering during the course of this investigation following

14  his meeting with you in your undercover capacity?

15  A.    In May?

16  Q.    In Augusta, Georgia.

17  A.    Yes.  Yes.

18        THE INTERPRETER:  Can you repeat?

19        MS. SOLARI:  A letter that Mr. Villone sent to KS

20  Engineering following a meeting with this agent in an undercover

21  role in Augusta, Georgia.

22  BY MS. SOLARI:

23  Q.    Who were you pretending to be to Mr. Villone at that time?

24  A.    John Constantine.

25  Q.    Who was John Constantine?

25

1  A.    John Constantine was both an employee of Siemens and the

2  owner of a private equipment company.

3  Q.    Were you meeting with Mr. Villone for purposes of

4  facilitating his purchase of the VECTRA 40G?

5  A.    I was.

6  Q.    So in the letter to KS Engineering, did Mr. Villone

7  summarize, in essence, his meeting with you in Augusta?

8  A.    He did.

9  Q.    And I will paraphrase here, but did Mr. Villone report

10 back that he had vetted you and did, in fact, believe you to be

11 a real manager and someone who could actually procure the VECTRA

12 for Mr. Villone and his associates?

13 A.    He did.

14      THE INTERPRETER:  He did believe or he did not believe?

15      MS. SOLARI:  He did believe.

16 BY MS. SOLARI:

17 Q.    Did he report back to KS Engineering, in essence, that he

18 had successfully convinced you that the business attempting to

19 procure the VECTRA was a business located in the United States?

20 A.    He did.

21 Q.    Had you made Mr. Villone aware at that time that certain

22 Russian entities had been contacting Siemens in an attempt to

23 procure the VECTRA?

24 A.    I did.

25 Q.    Did Mr. Villone write:  Of course, Siemens refused, but

26

1    the attention is still very high, or words to that effect?

2    A.    Yes, he did.

3    Q.    Did he then caution the defendant's company, "Therefore,

4    please ask client to stop asking for VECTRA; we have VECTRA now

5    with this way"?

6    A.    He did.

7    Q.    And the client, as we now know from the defendant's

8    admissions, was, in fact, Gazprom Neft?

9    A.    That's correct.

10          MS. SOLARI:  Thank you, Special Agent.

11          Thank you, Your Honor.

12          THE COURT:  Mr. Danzig, any recross?

13          MR. DANZIG:  No, Your Honor.

14          THE COURT:  All right.  Special Agent Conley, you may

15   step down.

16          Ms. Solari, does the government have any other

17   witnesses?

18          MS. SOLARI:  No.  That's the government's witnesses and

19   their evidence, Your Honor.

20          THE COURT:  All right.

21          Mr. Danzig, I'll hear from the defense any evidence or

22   witnesses on the subject of detention.

23          MR. DANZIG:  No evidence or witnesses, just proffer and

24   argument at the proper time.

25          THE COURT:  Just argument and proffer?  All right.

1  Well, what I'll do, then, is I'll let you combine your proffer

2  and your argument.  I'll hear from the government first on its

3  motion, and then I'll hear from the defense.

4      MR. DANZIG:  Thank you.

5      MS. SOLARI:  Thank you, Your Honor.  I will take the

6  3142(g) elements in turn, if I may.  As far as the nature and

7  circumstances of the charged offense, this is a national

8  security offense.  The evidence shows the defendant was working

9  on behalf of an embargoed Russian state-owned company, which is

10  Russia's third largest oil and gas company, to obtain a

11  multi-million dollar item that has been deemed by our President

12  to be a risk to U. S. national security in the hands of that

13  particular user.

14      The government proffers, Your Honor, that it will

15  present to the grand jury in the first week of October an

16  indictment that includes this defendant and alleges violations

17  of Section 371, violation of U. S. export law, a wire fraud

18  conspiracy and an international money laundering conspiracy.

19      In particular, Your Honor, this defendant and others

20  facilitated the movement of just short of three million dollars

21  from overseas into the U. S. as a downpayment for this

22  commodity.  The entire amount paid by the defendant's company

23  for the item would have been in the area of 15 to 17 million

24  dollars.

25      With regard to (g)(2), Your Honor, I submit the weight

1  of the evidence against this defendant is particularly strong.

2  His guilt will be established by his own emails and those of his

3  co-conspirators, contracts to which he is a party, proffers of

4  his co-conspirator, Mr. Villone, and others, recorded undercover

5  activity, and the defendant's own admissions to law enforcement.

6          The history and characteristics of this defendant are

7  not fully known to the government, Your Honor.  I believe, based

8  on my limited experience with Mr. Nikitin, he has been

9  professional and polite, however, I note he has not yet been

10  fully interviewed by Officer Miller, as he declined to do so

11  outside the presence of counsel.  He has what I recall --

12          THE INTERPRETER:  Excuse me.  I'm sorry.  Could you slow

13  down?  Declined to interview with Mr. Miller?

14          MS. SOLARI:  Yes.  His company appears to have

15  significant resources --

16          THE INTERPRETER:  Excuse me.  Could you just explain,

17  who is Mr. Miller?

18          MS. SOLARI:  Officer Miller, U. S. Probation.

19          The defendant's company appears to have significant

20  resources; however, we're not aware of any accounts or real

21  property or anything else the U. S. could exercise jurisdiction

22  over were the defendant to flee the country.

23          The defendant has no ties to our district, that we know

24  of, other than his criminal activity here.  And he's employed by

25  a company that will soon be under indictment.

1       The government noted, Your Honor, that the defendant

2    claimed during his initial appearance to have been in jail once

3    before, but we do not know what for or where.

4       Perhaps of greatest significance, Your Honor, is the

5    defendant's ability to depart our jurisdiction that I submit we

6    cannot prevent through any means short of detention.  I believe

7    we all know that a location monitor is only as reliable as he

8    who wears it, as it can be easily removed.

9       The defendant, should he go to a Russian Consulate,

10   would be taken in and, as far as we know, provided a travel

11   document that would facilitate his departure from the U. S.  And

12   certainly were he to return to Russia or any other country with

13   whom we have no extradition treaty, we would be unable to regain

14   his presence here in our jurisdiction.

15      For those reasons, Your Honor, I submit not that the

16   defendant is a danger to the community, but that the

17   government's evidence has shown by a preponderance of the

18   evidence that he is such a serious risk of flight that, again,

19   there are no conditions or combination of conditions that can

20   reasonably ensure his presence here short of detention.

21      I will note, Your Honor, that Mr. Villone, who may have

22   appeared similarly situated, was, after some period of delay,

23   granted a bond, which was not opposed by the government.  The

24   distinction, however, between these two defendants, Your Honor,

25   in large part, was Mr. Villone's prompt and incredibly

1   significant cooperation with the government that manifested to

2   us his genuine desire to remain and to cooperate in furtherance

3   of the investigation.

4          The government agrees that circumstances here were not

5   necessarily ideal for Mr. Nikitin's cooperation; however, we did

6   have a window of time in which we believe he could have

7   significantly furthered our investigation.  However -- and this

8   is certainly his right -- he elected at that time not to do so.

9   Thank you, Your Honor.

10          THE COURT:  Thank you, Ms. Solari.

11          Mr. Danzig, I'll hear from the defense.

12          MR. DANZIG:  Thank you, Your Honor.  I'll go through,

13   Your Honor, also the 3142(g) factors to be considered by this

14   Court in determining whether there are conditions that we submit

15   can be imposed on Mr. Nikitin that will reasonably assure his

16   presence for any and all hearings in this case.

17          In fact, Mr. Nikitin is very eager for his day in court

18   and to move this case along so that his innocence can be

19   established.

20          This is not a presumption case.  I understand the

21   government's not moving under safety to the community, but

22   solely under risk of flight.  I think it is inappropriate for

23   the government to raise as part of their factors Mr. Nikitin's

24   determination that he would not talk to the Pretrial Services

25   officer outside the presence of counsel.  He's afforded a

1  constitutional right to counsel and had counsel certainly from

2  the date of the initial hearing.  The pretrial services officer,

3  to my knowledge, and I'd proffer to the Court, never contacted

4  Mr. Johnson, who was retained before I was to represent

5  Mr. Nikitin.  So I think that that's just not worthy of any

6  consideration.

7          The complaint alleges, in essence, that a multi-national

8  company purchased -- makes and refurbishes part of an engine,

9  and it got -- was to be sold to an Italian company who was in

10  contract with a Russian company to purchase that, and I believe

11  I heard from the agent's testimony something about selling it in

12  Dubai or in the Middle East.

13         I know there are certainly serious potential charges

14  here.  Right now it's just a 371 conspiracy.  But I protest that

15  the government under factor (g)(1) is overstating the

16  significance of the sale of an engine by four different parties,

17  an engine that is available, sold by one of the largest

18  companies in the world, all over the world.

19         Mr. Nikitin is -- has been married for 30 years.  He's

20  got two children and a grandchild.  I understood that the agent

21  says that Mr. Nikitin said something about being in jail before.

22  I would contest that.  My understanding of Mr. Nikitin that he

23  does not have any criminal record.

24         The weight of the evidence against the person:  I think

25  there will be, if this case does get true billed, a significant

1   amount of disagreement over the legality and the factual issues.

2   But be that as it may, Mr. Nikitin offered to cooperate.  The

3   government wanted him to cooperate to try and lure people to the

4   United States.  He was agreeable to doing that, but the

5   government couldn't effectuate it because they had arrested him.

6          So when he gets arrested, when the notice of his arrest

7   is publicly available, when his wife does not know where he is

8   and is able to determine that he's been arrested, it sort of

9   makes it --

10          THE COURT:  Precludes useful participation.

11          MR. DANZIG:  Right.  You can agree to participate and

12   cooperate, but it would, by nature of the government's actions,

13   correct, Your Honor, preclude that.

14          I think, Your Honor, that -- and I understand the Court

15   will give all these factors consideration.  To me, the

16   government is focused almost exclusively on the view that

17   Mr. Nikitin is Russian and that somehow he would flee to Russia

18   and there would be no way to get him back, although they

19   acknowledge that Mr. Villone, who's Italian, he certainly was

20   able to get a bond, which would be similar to Mr. Nikitin's

21   situation.  I fear -- and I hope --

22          THE COURT:  Mr. Danzig, is the difference in extradition

23   standards between Italy and Russia something I can consider?

24          MR. DANZIG:  I don't know what the difference is.  I'd

25   venture to say from my experience that there probably is an MLAT

1    with -- Mutual Legal Assistance Treaty -- with Italy and perhaps

2    not one with Russia.  But Mr. Nikitin would be willing to waive

3    his right to contest extradition if he's let out on bond.  So I

4    think that that factor would be tempered somewhat because of

5    that.

6          You know, because he is Russian, and these days in this

7    country Russia is, in essence, a dirty word, I think that

8    factors significantly into the government's consideration, and I

9    don't think it's an appropriate factor.  If you separate out

10   the -- you know, if he were Italian or from any other country,

11   even Morocco, which I know doesn't have an extradition treaty

12   with the United States, I think it would be a different

13   situation.  But by saying this is Russian, I think it

14   exacerbates or over -- overemphasizes and states a fact that

15   he's not a citizen of the United States.

16         I do understand -- and then the other factor is the

17   nature and seriousness to the community, and obviously there is

18   none.

19         That's not to say I'm not cognizant of any issue

20   involving a foreign national who's arrested in the United

21   States, even one like Mr. Nikitin who had agreed to cooperate.

22   It's gotta be something more than just a foreign citizen who's

23   arrested in the United States.

24         And I spoke with the prosecutor yesterday to give her

25   some thoughts on whether we could reach an agreement, and she

1   was very professional, very courteous.  I look forward to

2   working with her on the case.  We couldn't reach an agreement.

3   But I do have things that I think would allow the Court to feel

4   comfortable that Mr. Nikitin would not be a risk of flight such

5   that terms could be imposed to allow this Court to grant a bond

6   to Mr. Nikitin such as they granted a bond to Mr. Villone.

7           I would suggest the government already has his passport.

8   I understand that they say, well, he could just go to the

9   Consulate -- I'm not sure where the local Consulate is or the

10  nearest one for Russia is -- and get a new passport.  But I

11  would combine that, Your Honor, with electronic GPS monitoring,

12  which would allow -- and I don't believe there's a Consulate

13  here in Savannah, but it would certainly allow the government to

14  be fully aware of if he tried to flee the jurisdiction or tried

15  to cut off the electronic monitoring device.

16          Mr. Nikitin would be willing to rent an apartment here

17  in Savannah at his own expense, allow periodic unannounced

18  visits by the probation officer to ensure that he's there.

19  Obviously with GPS monitoring he can check in and out every day

20  as well.  And I think that perhaps what I've heard the

21  government talk about is he has no property and no security

22  here, nothing that the government could, quote, exercise

23  jurisdiction over.  Were this a case of a local resident and if

24  that person had personal or had real property here, that that

25  person could secure bond by posting his property.

35

1          Mr. Nikitin doesn't have property here, but we have a

2     valid, appropriate, equally secured alternative that's used in

3     the context of international trade and business every day.  And

4     that would be an irrevocable and confirmed letter of credit.

5     Irrevocable and confirmed letter of credit is an agreement

6     between banks.

7          In essence, Mr. Nikitin would post property, his

8     property in Russia, as collateral for the letter of credit to be

9     issued by a Russian bank.  That Russian bank contracts with a

10    United States bank to issue that irrevocable letter of credit in

11    favor of his appearance here in court.  Were he not to appear in

12    court, this Court could call on that irrevocable confirmed

13    letter of credit and receive the property funds pursuant to that

14    arrangement.

15         It is a common international practice.  I understand it

16    would take some time to put into effect, and we would certainly

17    get that in order before we sought Mr. Nikitin to be set out.

18    But it's a standard practice.  It would provide both

19    jurisdiction and security to the Court.

20         We would suggest $250,000, which is about half of what

21    his company makes, and we would be willing to provide

22    Mr. Nikitin's and his company's tax returns so that this Court

23    could verify that the amount is significant and would cause

24    significant harm to he and his wife and his two children and his

25    grandchild were he not to appear.

1        And so what I've tried to craft for this Court is a

2    significant, onerous terms and conditions.  And the one wrinkle

3    that is a significant wrinkle for this Court is the fact that

4    he's a Russian citizen, and so we tried to craft provisions for

5    this Court that would ensure his staying here and provide

6    jurisdiction and collateral, something other than, you know,

7    certainly a signature bond, so that he can stay here and have

8    his day in court.  Thank you, Your Honor.

9        THE COURT:  Thank you, Mr. Danzig.

10       Ms. Solari, why isn't a hotel room here locally with

11   terms of, essentially, home incarceration, if I were to go that

12   way, coupled with GPS monitoring, inadequate in the government's

13   view?

14       MS. SOLARI:  I cannot imagine what would motivate the

15   defendant to stay.  He could simply cut his ankle monitor, as

16   defendants have in the past.  We would have no way, then, to

17   track his location, and a visit to a Russian Embassy -- do you

18   know where the nearest one is?

19       AGENT CONLEY:  I think there's one in Miami and D.C.

20       MS. SOLARI:  Visit to a Russian Consulate in Miami or

21   D.C. could have the defendant home.

22       There's simply no way to guarantee he will remain.  And

23   I understand a 100 percent guarantee is not required.  But I

24   don't think that's any reasonable assurance.

25       Again, the defendant was acting here, by his own

37

1    admission, on behalf of the Russian government.  I cannot

2    imagine why he would want to stay here when all that awaits him

3    in the Southern District is a trial and potentially a lengthy

4    period of incarceration.

5           Were he to leave our jurisdiction and return to the only

6    place where we know he has substantial contacts, we would never

7    again be able to regain his presence here.

8           THE COURT:  Thank you, Ms. Solari.

9           Mr. Danzig, the law is fairly clear that I am obligated

10   to try to craft a set of conditions that I believe will

11   reasonably assure the presence of the defendant.  But it's also

12   clear that those conditions cannot reach the point of

13   unreasonableness to the point that they become almost tantamount

14   to detention in some form or fashion.  Aren't you asking me to

15   kind of stray to that line here?

16          MR. DANZIG:  I don't believe so, Your Honor.  There is a

17   world of difference in him being locked up in the Liberty County

18   Jail and being in an apartment or a hotel here in Savannah.  It

19   certainly would help him with his defense, in crafting and

20   preparing his defense significantly.  It's something that

21   Mr. Nikitin wants, he desires, as he doesn't want to stay locked

22   up in the Liberty County Jail, as nice of a facility that it is.

23   So we would disagree that it's tantamount to lockup.

24          And if I may address the Consulate issue in Miami and

25   D.C., Mr. Nikitin does not have a passport or a driver's

1   license.  He wouldn't be able to get on a plane.  And so he's

2   kind of stuck here in Savannah.  I guess he could get on a bus,

3   but he's got a GPS monitor and tracking.  If the tracking -- if

4   he tries to cut it off, it immediately alarms.  We think that

5   would be sufficient, given the facts of this case, that he

6   should be granted conditions outside of confinement.

7           THE COURT:  Thank you.  Mr. Miller, what's Pretrial

8   Services' view here?

9           USPO MILLER:  Your Honor, we agree with the government

10  in this case.  Even if he is to consent to an interview, we

11  can't guarantee that we can identify his full assets, and so

12  then we wouldn't be able to determine an appropriate bond in the

13  case or a bond recommendation.

14          THE COURT:  Is Mr. Danzig correct, that any cutting of

15  the monitor is something that is immediately alerted?

16          USPO MILLER:  So we would receive immediate notification

17  of a tamper, Your Honor.  Then it's up to the officer to

18  respond.  But once it's cut, we no longer know where he's gone

19  or what's occurred.  So if he was -- as an example, if he was to

20  cut it right outside of a vehicle and get in that vehicle, we

21  wouldn't know where the vehicle went.

22          THE COURT:  All right.  I'm going to take a five-minute

23  recess.  I'll be back to address this.

24          CSO:  All rise.

25   (Proceedings stood in recess from 10:18 a.m. until 10:21 a.m.)

1        THE COURT:  All right.  Before the Court this morning is

2   the government's motion to detain pending trial.  Specifically,

3   the government is proceeding under 18 United States Code Section

4   3142(f)(2)(A), an allegation that there is a serious risk that

5   the defendant will flee.

6        I have considered the evidence and argument presented

7   this morning, and it is my determination that the Court -- it's

8   the determination, rather, that the government has sustained its

9   burden of demonstrating by a preponderance of the evidence that

10  no condition or combination of conditions of release will

11  reasonably assure Mr. Nikitin's appearance as required.

12       I premise this in part upon the weight of the evidence

13  against Mr. Nikitin, the fact that he is subject to a lengthy

14  period of incarceration if he were to be convicted, the fact

15  that he has a lack of significant community or family ties in

16  this district, the fact that he has significant family or other

17  ties outside of the United States.  I have not in any way relied

18  upon any current climate or popular view regarding Russia or how

19  the community at large may view that particular nation-state.

20  Has no bearing on the Court's analysis.

21       I will enter an order to that effect, and Mr. Nikitin is

22  to be detained pending further proceedings in this matter.

23       Mr. Danzig, anything else from the defense at this

24  point?

25       MR. DANZIG:  No, Your Honor.

40

1         THE COURT:  Ms. Solari, anything else from the

2    government?

3         MS. SOLARI:  No, sir, Your Honor.

4         THE COURT:  All right.  Thank you, Counsel.  That

5    concludes this matter.  And, Mr. Danzig, I presume you'll make

6    your notice of appearance on the record?

7         MR. DANZIG:  I'm going to walk upstairs right now, Your

8    Honor.

9         THE COURT:  All right.  Thank you.

10              (Proceedings concluded at 10:23 a.m.)

11                       - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly A. McKee, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the electronically recorded proceedings held in the above-entitled matter and that the transcript subsequently transcribed by me is true and accurate to the best of my ability to hear and understand the recording, and the page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 16th day of December, 2019.

*Kelly A. McKee*
_____
KELLY A. McKEE, CCR, RMR, CCP, RDR
#2731