UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CR: 419-150 |
| OLEG VLADISLAVOVICH NIKITIN | ) | |

# PLEA AGREEMENT

Defendant Oleg Vladislavovich Nikitin, represented by his counsel Anthony M. Capozzolo, Alexey V. Tarasov and Harry D. Dixon, Jr., and the United States of America, represented by Assistant United States Attorneys Jennifer G. Solari and Steven H. Lee, have reached a plea agreement in this case. The terms and conditions of that agreement are as follows.

1. Guilty Plea

Defendant agrees to enter a plea of guilty to Count One of the Third Superseding Indictment, which charges a violation of 18 U.S.C. § 371.

2. Elements and Factual Basis

The elements necessary to prove the offense charged in Count One are (1) two or more persons in some way agreed to try to accomplish a shared and unlawful plan; (2) Defendant knew the unlawful purpose of the plan and willfully joined in it; (3) during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and (4) the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

Defendant agrees that he is, in fact, guilty of this offense. He agrees to the accuracy of the following facts, which satisfy each of the offense's required elements:

**Defendants and Other Entities**

a. Company A, the identity of which is known to the grand jury, was a multinational company that specialized in industrial manufacturing. Company A operated offices and production facilities throughout the United States.

b. WORLD MINING AND OIL SUPPLY ("WMO") advertised as a sourcing and supply company that specialized in industrial, mining, and oil and gas products. Its corporate office was located in Dacula, Georgia.

c. DALI BAGROU was the President, Owner and Managing Director of Defendant WMO and operated from the WMO offices in Dacula, Georgia.

d. GVA INTERNATIONAL OIL AND GAS SERVICES (a/k/a "GVA INTERNATIONAL DMCC"), based in Italy, was a business that offered services in electrical engineering, mechanical and HVAC engineering, and energy and communication systems in the oil/gas, petrochemical, manufacturing and energy industries.

e. G.V. was the Commercial Director and Manager of Defendant GVA INTERNATIONAL OIL AND GAS SERVICES.

f. BRUNO CAPARINI was the Commercial Director of an Italian engineering and construction company based in Italy.

g. KS ENGINEERING (a/k/a "KS-INZHINIRING CO. LTD." and "KS-INZHINIRING, LLC,") was an engineering service company based in St. Petersburg,

Russia, that specialized in systems for coal, gas, oil, nuclear and renewable energy power plants.

h. ANTON CHEREMUKHIN was an employee of Defendant KS ENGINEERING.

i. **OLEG VLADISLAVOVICH NIKITIN** was the General Director of Defendant KS ENGINEERING.

j. Company B, the identity of which is known to the grand jury, was a Russian government-controlled business based in St. Petersburg, Russia, that engaged in the extraction, production, transportation and sale of oil and gas.

**The International Emergency Economic Powers Act & The Export Control Reform Act of 2018**

k. The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701-1707, granted the President of the United States the authority to deal with unusual or extraordinary threats to the national security, foreign policy, or economy of the United States.

l. Pursuant to Title 50, United States Code, Sections 1705(a) and (c) of IEEPA, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation promulgated thereunder, including the Export Administration Regulations, as more fully described below.

m. The Export Administration Act of 1979, Title 50 Appendix, United States Code, Sections 2401-2420, regulated the export of goods, technology, and software from the United States. Pursuant to the Export Administration Act, the U.S. Department of Commerce ("Department of Commerce") promulgated the Export

Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774, which contained restrictions on the export of goods from the United States.

n Although the Export Administration Act lapsed in August 2001, pursuant to his authority under IEEPA, the President issued Executive Order 13222 on or about August 17, 2001. In that Order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the Export Administration Act's expiration. Pursuant to IEEPA, the President, and subsequent Presidents, ordered that the EAR's provisions remain in full force and effect despite the expiration of the Export Administration Act.

o. On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. § 4801 et seq. In part, ECRA provides permanent statutory authority for the EAR. For conduct that predates August 13, 2018, IEEPA is the controlling statute. For conduct occurring after August 13, 2018, ECRA is the controlling statute.

p. Through the EAR, the Department of Commerce, Bureau of Industry and Security ("BIS"), reviewed and controlled the export from the United States to foreign countries of certain U.S. items. 15 C.F.R. §§ 734.2-.3. In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations, or that could be detrimental to the foreign policy or national security of the

United States. Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.

q. The EAR made it unlawful to attempt conduct prohibited by, or contrary to, or refrain from engaging in any conduct required by, the EAR. It was also unlawful to violate any order, license or authorization issued thereunder, or to cause, aid, abet, solicit, attempt, or conspire to commit a violation of the EAR, or any order, license, or authorization issued thereunder. The EAR prohibited the ordering, buying, removing, concealing, storing, use, sale, loan, disposition, transfer, transport, financing, forwarding, or other servicing, in whole or in part, of any item exported or to be exported from the United States that is subject to the EAR with knowledge that a violation of the EAR, or any order, license, or authorization issued thereunder, has occurred. See 15 C.F.R. § 764.2(a)-(k).

**The Commodity**

r. The commodity at issue ("the Commodity") was a Vectra 40G power turbine designed and manufactured for integration with gas generators to enable direct drive of high power gas compressors.

Licensing Requirements and Status

s. The U.S. Department of Commerce required an export license for the export of the Commodity when the Commodity would be used directly or indirectly in exploration for, or production of, oil or gas in Russian deepwater (greater than 500 feet) or Arctic offshore locations or shale formations, or when one was unable to

determine whether the item would be used in such projects. (15 C.F.R. Part 746.5 ("Russian Industry Sector Sanctions")).

t. At no time did the defendants, WORLD MINING AND OIL SUPPLY ("WMO"), DALI BAGROU, GVA INTERNATIONAL OIL AND GAS SERVICES, BRUNO CAPARINI, KS ENGINEERING, ANTON CHEREMUKHIN, **OLEG VLADISLAVOVICH NIKITIN**, G.V. or Company B apply for, receive or possess a license or authorization from The Department of Commerce - BIS, to export the Commodity.

u. Beginning on a date unknown to the grand jury, but at least in or around February 2017, and continuing until on or about the date of the original indictment, in Chatham and Richmond Counties, within the Southern District of Georgia, and elsewhere, the defendants,

WORLD MINING AND OIL SUPPLY
a/k/a "WMO,"

DALI BAGROU,

GVA INTERNATIONAL OIL AND
GAS SERVICES,
a/k/a "GVA INTERNATIONAL
DMCC,"

BRUNO CAPARINI,

KS ENGINEERING,
a/k/a "KS-INZHINIRING CO.
LTD.,"
a/k/a "KS-INZHINIRING,
LLC," and

ANTON CHEREMUKHIN, and

**OLEG VLADISLAVOVICH NIKITIN,**

aided and abetted by each other and by others unknown, with some joining the conspiracy earlier and others joining later, did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other and with others known and unknown to the grand jury to commit offenses against the United States, and to defraud the United States, to wit:

i. to willfully export, attempt to export, and attempt to cause the export of the Commodity from the United States when the Commodity would be used directly or indirectly in exploration for, or production of, oil or gas in Russian deepwater (greater than 500 feet) or Arctic offshore locations or shale formations, or when one was unable to determine whether the item would be used in such projects, without first having obtained the required licenses or authorizations from BIS, in violation of Title 50, United States Code, Sections 1702 and 1705; and 15 C.F.R. Part 746.5 and 764.2(a)-(k);

ii. to willfully export, attempt to export, and cause the export of the Commodity from the United States when the Commodity would be used directly or indirectly in exploration for, or production of, oil or gas in Russian deepwater (greater than 500 feet) or Arctic offshore locations or shale formations, or when one was unable to determine whether the item would be used in such projects, without first having obtained the required licenses or authorizations from BIS, in violation of 50 U.S.C. § 4819 and 15 C.F.R. Part 746.5 and 764.2(a)-(k); and

iii. to fraudulently and knowingly export and send, and attempt to cause to be exported and sent, from the United States, merchandise, articles, and objects contrary to a law and regulation of the United States, that is, Title 18, United States Code, Sections 1343, and 50 U.S.C. §§ 1705 and 4819, in violation of Title 18, United States Code, Section 554.

iv. to defraud the Department of Commerce by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods from the United States to restricted parties without authorization or a license, by deceit, craft, trickery, and dishonest means.

**Objects of the Conspiracy**

v. The objects of the conspiracy were:

i. to illegally enrich the conspirators by unlawfully exporting goods from the United States;

ii. to evade the regulations, prohibitions, and licensing requirements of the IEEPA, the ECRA, and the EAR; and

iii. to conceal the prohibited activities from Company A and the United States Government so as to avoid penalties and disruption of the illegal activity.

**Manner and Means of the Conspiracy**

w. It was a part of the conspiracy and among its manner and means that some of the defendants, aided and abetted by each other and others:

i. entered into contracts for the purpose of procuring the Commodity from Company A;

ii. knowingly included materially false information in the contracts to obscure the true end user and end use of the Commodity;

iii. knowingly created additional false corporate documents and business plans to further obfuscate the intended end user and end use of the Commodity;

iv. knowingly provided Company A materially false and fraudulent information regarding the end user and end use of the Commodity;

v. transmitted and caused to be transmitted email communications by wire in interstate and foreign commerce; and

vi. transmitted and caused to be transmitted monetary payments by wire in interstate and foreign commerce.

**Overt Acts**

x. In furtherance of the conspiracy and to accomplish its objects, at least one of the Defendants committed or caused to be committed, in the Southern District of Georgia and elsewhere, at least one of the following overt acts:

i. On or about February 27, 2018, Defendant KS ENGINEERING, by and through Defendants ANTON CHEREMUKHIN and **OLEG VLADISLAVOVICH NIKITIN**, sent a draft contract proposal to Defendant GVA INTERNATIONAL OIL AND GAS SERVICES, by and through G.V. In the contract, GVA INTERNATIONAL OIL AND GAS SERVICES agreed to obtain and sell the

Commodity to KS ENGINEERING. The agreement falsely stated that the Commodity would be used at the "Mordovskiy sugar factory, LLC," in Russia, which the parties to the contract and their representatives knew to be false.

ii. On or about March 5, 2018, Defendant KS ENGINEERING, by and through Defendants CHEREMUKHIN and NIKITIN, submitted a technical proposal to Company B, in which KS ENGINEERING proposed to provide the Commodity to Company B for use with the LM2500 Gas Generator as part of a Turbogenerator on the Prirazlomnaya Marine Ice-Resistant Stationary Platform.

iii. On or about June 22, 2018, with the advice and direction of G.V., Defendant BAGROU contacted Company A and inquired about purchasing the Commodity. BAGROU told Company A it was for a power plant that BAGROU was purportedly planning to build near Atlanta, Georgia. In fact, as G.V. and BAGROU then knew, BAGROU had no plans to build a power plant in Georgia.

iv. On or about July 19, 2018, G.V. sent a letter on behalf of Defendant GVA INTERNATIONAL OIL AND GAS SERVICES to Defendant KS ENGINEERING, confirming GVA INTERNATIONAL OIL AND GAS SERVICES's receipt of KS ENGINEERING's advance payment on May 8, 2018, and predicting delivery of the Commodity and other components to KS ENGINEERING on November 1, 2018.

v. On or about July 20, 2018, Defendant CHEREMUKHIN forwarded G.V.'s letter to Company B's Deputy Head of Office, Head of the MTR Supply Department, Office of Material and Technical Provision.

vi. On or about September 18, 2018, G.V. emailed Defendant CHEREMUKHIN the fictitious and false affidavit and business plan submitted to Company A as evidence that BAGROU and G.V. could successfully procure the Commodity from Company A.

vii. On or about October 10, 2018, a Undercover Agent ("UCA") based in Savannah, Georgia informed Defendant BAGROU that Company A was concerned the Commodity would be exported from the United States without a license to be installed on foreign military naval vessels. Defendant BAGROU assured the UCA that the Commodity would remain in the United States after its purchase from Company A. Additionally, BAGROU assured the UCA that he was not ordering the Commodity on behalf of another person or company.

viii. Between on or about November 23, 2018 and on or about December 2, 2018, Defendant BAGROU met with Defendant CHEREMUKHIN in Dubai, United Arab of Emirates to discuss ordering and transporting the Commodity from the United States to another country without a license from BIS.

ix. On or about November 24, 2018, G.V. emailed Defendant CHEREMUKHIN proof of an $980,000.00 payment to Defendant BAGROU's company, as well as a projected delivery date for the Commodity by BAGROU's company. G.V. also emailed CHEREMUKHIN a phony "portable Temporary Generation Power project" contract between Defendant GVA INTERNATIONAL and BAGROU's company.

x. On or about December 21, 2018, in response to a request from Company A for more information about the purported energy project in which the Commodity would be used, G.V. emailed Defendant CHEREMUKHIN and asked CHEREMUKHIN to help him craft "A PERFECT ANSWER" to Company A's questions about " 'our' project to produce energy."

xi. On or about February 8, 2019, Defendant BAGROU received and forwarded a budgetary proposal from Company A for the purchase of the Commodity at $7,500,000.00 USD, which BAGROU forwarded to G.V. G.V. then forwarded the proposal (with the Company A price redacted) to Defendant CHEREMUKHIN. G.V. informed CHEREMUKHIN that the price for the Commodity was higher than expected because it was no longer in production and because it was under a "strict end user control."

xii. On or about February 9, 2019, G.V., on behalf of Defendant GVA INTERNATIONAL OIL AND GAS SERVICES, sent a Request for Contract Amendment to Defendants KS ENGINEERING, CHEREMUKHIN and **NIKITIN** based upon the price and delivery time for the Commodity quoted by Company A. In the request, G.V. heralded his accomplishment of the "almost impossible mission" of getting Company A to sell the Commodity. He reminded KS ENGINEERING personnel that he was able to do so by convincing Company A that the true end user of the Commodity was located in the U.S. G.V. went on to state that once GVA INTERNATIONAL OIL AND GAS SERVICES had the Commodity, "then from USA we can move [the Commodity] freely and easy between our Company Group Facilities

in UAE. . . for delivery to final destination." Pursuant to the amended contract, Defendant KS ENGINEERING would pay Defendant GVA INTERNATIONAL OIL AND GAS SERVICES 15.408.587 Euro (approximately $17,300,000.00 USD) for the Commodity.

xiii. On or about May 13, 2019, G.V., on behalf of Defendant GVA INTERNATIONAL OIL AND GAS, sent Defendants CHEREMUKHIN and KS ENGINEERING a letter summarizing his meeting with the UCA. In his letter, G.V. wrote, "My personal impression of [an Undercover Agent] after 2 hours of discussion is that he is a REAL manager involved in [Company A] business and he considerate (sic) us a very interesting USA 'customer' for our energy production program. He believe (sic) that. He AWARE US (sic) that ROSNEF Company linked from Russia contacted AGAIN ONE MONTH AGO ASKING FOR [THE COMMODITY] from Russia!!!!! Of course [Company A] refuse (sic) but the attention is still very high. Therefore please ask client TO STOP ASKING FOR [THE COMMODITY] We have [the Commodity] now with this way."

xiv. On or about August 20, 2019, the UCA sent an email to G.V., in which he stated, in part, "[Company A] is asking way too many questions about the end user for this system being [Company B] and they are threatening to stop the shipment based on breach of contract. . . . Please confirm you have received this email and keep this between us . . . ." On the same date, G.V. replied to the UCA by email, "yes received. All is ok. I take care and I am working on the transfer."

xv. On or about August 28, 2019, G.V. and Defendant BAGROU met with the UCA and another undercover agent in Savannah, Georgia, to discuss the sale of the Commodity. During the meeting, G.V. discussed how the UCAs should falsify the shipping documents for the Commodity to conceal the true end use and user.

xvi. On or about September 1, 2019, Defendant CHEREMUHKIN asked G.V. to send additional photographs of the Commodity. CHEREMUHKIN said Defendant NIKITIN would travel to the U.S. to view the Commodity to ensure it was available.

xvii. On or about September 17, 2019, Defendant NIKITIN traveled to the Southern District of Georgia to view the Commodity.

All in violation of Title 18, United States Code, Sections 371 and 2.

3. Possible Sentence

Defendant's guilty plea will subject him to the following maximum possible sentence: 5 years' imprisonment, 3 years' supervised release, a $250,000 fine, such restitution as may be ordered by the Court, and forfeiture of all forfeitable assets. The Court additionally must impose a $100 special assessment per count of conviction.

4. No Promised Sentence

No one has promised Defendant that the Court will impose any particular sentence or a sentence within any particular range. The Court is not bound by any estimate of sentence given or recommendations made by Defendant's counsel, the

government, the U.S. Probation Office, or anyone else. The Court may impose a sentence up to the statutory maximum. Defendant will not be allowed to withdraw his plea of guilty if he receives a more severe sentence than he expects.

5. Court's Use of Sentencing Guidelines

The Court is obligated to use the United States Sentencing Guidelines to calculate the applicable guideline range for Defendant's offense. The Sentencing Guidelines are advisory; the Court is not required to impose a sentence within the range those Guidelines suggest. The Court will consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), in determining the Defendant's sentence. The Sentencing Guidelines are based on all of Defendant's relevant conduct, pursuant to U.S.S.G. § 1B1.3, not just the conduct underlying the particular Count or Counts to which Defendant is pleading guilty.

6. Agreements Regarding Sentencing Guidelines

a. Use of Information

Nothing in this agreement precludes the government from providing full and accurate information to the Court and U.S. Probation Office for use in calculating the applicable Sentencing Guidelines range. Any incriminating information provided by the defendant during his cooperation will not be used in determining the applicable Guidelines range, pursuant to Section 1B1.8 of the Sentencing Guidelines.

b. Acceptance of Responsibility

If the Court determines that Defendant qualifies for an adjustment under U.S.S.G. § 3E1.1(a), and the offense level prior to operation of § 3E1.1(a) is 16 or greater, the government will move for an additional one-level reduction in offense level pursuant to Section 3E1.1(b) based on Defendant's timely notification of his intention to enter a guilty plea.

7. Dismissal of Other Counts

At sentencing, the government will move to dismiss any other Counts of the Third Superseding Indictment that remain pending against Defendant, as well as the original, First and Second Superseding Indictments.

8. Cooperation

a. Complete and Truthful Cooperation Required

Defendant must provide full, complete, candid, and truthful cooperation in the investigation and prosecution of the offenses charged in his Indictment and any related offenses. Defendant shall fully and truthfully disclose his knowledge of those offenses and shall fully and truthfully answer any question put to him by law enforcement officers about those offenses.

This agreement does not require Defendant to "make a case" against any particular person. His benefits under this agreement are conditioned only on his cooperation and truthfulness, not on the outcome of any trial, grand jury, or other proceeding.

b. Motion for Reduction in Sentence Based on Cooperation

The government, in its **sole discretion**, will decide whether Defendant's cooperation qualifies as "substantial assistance" pursuant to U.S.S.G. § 5K1.1 or Fed. R. Crim. P. 35 and thereby warrants the filing of a motion for downward departure or reduction in Defendant's sentence. If such a motion is filed, the Court, in its sole discretion, will decide whether, and to what extent, Defendant's sentence should be reduced. The Court is not required to accept any recommendation by the government that the Defendant's sentence be reduced.

9. Forfeiture

The government agrees not to pursue criminal forfeiture against Defendant.

10. Financial Obligations and Agreements

a. Special Assessment

Defendant agrees to pay a special assessment in the amount of $100.00, payable to the Clerk of the United States District Court, which shall be due immediately at the time of sentencing.

b. Required Financial Disclosures

By the date of sentencing, Defendant shall complete a financial disclosure form listing all his assets and financial interests, whether held directly or indirectly, solely or jointly, in his name or in the name of another. Defendant shall sign the financial disclosure form under penalty of perjury and provide that form to the Financial Litigation Unit of the United States Attorney's Office and to the United States Probation Office. Defendant authorizes the United States to obtain credit reports on

Defendant and to share the contents of those reports with the Court and the United States Probation Office. Defendant also authorizes the United States Attorney's Office to inspect and copy all financial documents and information held by the United States Probation Office.

c. Financial Examination

Defendant will submit to an examination under oath on the issue of his financial disclosures and assets if deemed necessary by the United States.

d. No Transfer of Assets

Defendant certifies that he has made no transfer of assets in contemplations of this prosecution for the purpose of evading or defeating financial obligations created by this Agreement or that may be imposed upon him by the Court at sentencing. Defendant promises that he will make no such transfers in the future.

e. Material Change in Circumstances

Defendant agrees to notify the United States of any material change in circumstances, as described in 18 U.S.C. § 3664(k), that occurs prior to sentencing in this case. Such notification will be made within seven days of the event giving rise to the changed circumstances, and in no event later than the date of sentencing.

f. Enforcement

Any payment schedule imposed by the Court is without prejudice to the United States to take all actions and remedies available to it to collect the full amount of the financial obligations imposed by the judgment of the Court in this case.

11. Waivers

a. Waiver of Appeal

Defendant entirely waives his right to a direct appeal of his conviction and sentence on any ground (including any argument that the statute to which the defendant is pleading guilty is unconstitutional or that the admitted conduct does not fall within the scope of the statute). The only exceptions are that the Defendant may file a direct appeal of his sentence if (1) the court enters a sentence above the statutory maximum, (2) the court enters a sentence above the advisory Sentencing Guidelines range found to apply by the court at sentencing; or (3) the Government appeals the sentence. Absent those exceptions, Defendant explicitly and irrevocably instructs his attorney not to file an appeal.

b. Waiver of Collateral Attack

Defendant entirely waives his right to collaterally attack his conviction and sentence on any ground and by any method, including but not limited to a 28 U.S.C. § 2255 motion. The only exception is that Defendant may collaterally attack his conviction and sentence based on a claim of ineffective assistance of counsel.

c. FOIA and Privacy Act Waiver

Defendant waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any record pertaining to the investigation or prosecution of this case under the authority of the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a, and all subsequent amendments thereto.

d. Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 Waiver

Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence ordinarily limit the admissibility of statements made by a defendant during the course of plea discussions or plea proceedings. Defendant knowingly and voluntarily waives the protections of these rules. If Defendant fails to plead guilty, or his plea of guilty is later withdrawn, all of Defendant's statements in connection with this plea, and any leads derived therefrom, shall be admissible for any and all purposes.

12. Possible Immigration Effects

Pleading guilty may have consequences with respect to immigration status if Defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses. Removal and other immigration consequences are the subject of a separate proceeding. No one, including Defendant's attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless agrees to plead guilty regardless of any immigration consequences, even if the consequence is his removal from the United States.

13. Defendant's Rights

Defendant has the right to be represented by counsel, and if necessary have the court appoint counsel, at trial and at every other critical stage of the proceeding. Defendant possesses a number of rights which he will waive by pleading guilty, including: the right to plead not guilty, or having already so pleaded, to persist in that plea; the right to a jury trial; and the right at trial to confront and cross-examine

adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

14. Satisfaction with Counsel

Defendant has had the benefit of legal counsel in negotiating this agreement. Defendant believes that his attorneys have represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice given and the work performed by his attorneys.

15. Breach of Plea Agreement

If Defendant fails to plead guilty, withdraws or attempts to withdraw his guilty plea, commits any new criminal conduct following the execution of this agreement, or otherwise breaches this agreement, the government is released from all of its agreements regarding Defendant's sentence, including any agreements regarding the calculation of Defendant's advisory Sentencing Guidelines. In addition, the government may declare the plea agreement null and void, reinstate any counts that may have been dismissed pursuant to the plea agreement, and/or file new charges against Defendant that might otherwise be barred by this plea agreement. Defendant waives any statute-of-limitations or speedy trial defense to prosecutions reinstated or commenced under this paragraph.

16. Entire Agreement

This agreement contains the entire agreement between the government and Defendant.

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

______________ Date

Karl I. Knoche
Chief, Criminal Division

11/18/2020
Date

Jennifer G. Solari
Assistant United States Attorney

3/16/21
Date

Steven H. Lee
Assistant United States Attorney

I have read and carefully reviewed this agreement with my attorney. I understand each provision of this agreement, and I voluntarily agree to it. I hereby stipulate that the factual basis set out therein is true and accurate in every respect.

11/10/2020 Nikitin Oleg

Date Oleg Nikitin, Defendant

I have fully explained to Defendant all of his rights, and I have carefully reviewed each and every part of this agreement with him. I believe that he fully and completely understands it, and that his decision to enter into this agreement is an informed, intelligent, and voluntary one.

11/17/2020

Date Anthony M. Capozzolo, Defendant's Attorney

11/16/2020 Alexey Tarasov

Date Alexey V. Tarasov, Defendant's Attorney

11/10/2020

Date Harry D. Dixon, Jr., Defendant's Attorney

Date Defendant's Attorney